Louis B. Heller, J.
Plaintiff moves pursuant to sections 211, 236 and 237 of the Domestic Relations Law for an order granting temporary support and maintenance for herself and three daughters and an award of counsel fees to her attorney pending the trial of this action.
Action was instituted by the personal service of a summons which bears the legend “ Action for Divorce.” A copy of the summons was filed with the Conciliation Bureau. The motion papers were served simultaneously with the summons.
Plaintiff’s moving affidavit in describing her cause of action for divorce merely alleges that defendant abandoned her on June 13, 1971 without providing support for her and their children. Nonsupport is not a ground for divorce. Abandonment in this case is similarly not a ground since the period of the alleged desertion is less than two years. However, on the hearing of the motion, plaintiff’s counsel argued that the defendant was guilty of acts of cruelty which constitute the gravamen of plaintiff’s cause of action. Similarly, in counsel’s letter to the court, it is stated that “ the grounds for divorce * * * are primarily physical and mental cruelty upon the wife.”
Under section 211 of the Domestic Relations Law a motion may be made for temporary alimony ‘ ‘ based on financial ability and need -only” and the motion papers may be served with a summons. A complaint is not served until 120 days from date of filing of notice of commencement of the action or the termination of conciliation proceedings.
*200 This court had occasion to construe section 211 of the Domestic Relations Law in Wolfson v. Wolfson (55 Misc 2d 86, 87) insofar as the sufficiency of allegations of a plaintiff’s cause of action, and there stated: “The reason section 211 interdicts the service of a complaint with a summons is to eliminate the itemization of rancorous charges and countercharges of marital disharmony that only inflame the estranged spouses and impede endeavors to reconcile the parties. What is the point in proscribing a complaint alleging the acrimonious details, /when the same incendiary elements, in all their spleenful specificity, are contained in an affidavit? The spirit as well as the letter of the statute must be observed.
“ The matrimonial Bar is put on notice that moving papers in actions for divorce or separation may not include, besides information as to financial ability and need, anything but the broadest outline of the cause or causes of action.” See, also, Loretta B. v. Gerard B. (30 A D 2d 347 [2d Dept.]), in which the Appellate Division affirmed this court’s order granting temporary alimony prior to the service of the complaint.
Failure to amplify or fully describe a cause of action for divorce in the moving papers does not render them defective. The paramount question to be considered by the court is not defendant’s denials -of cruel and inhuman treatment nor whether he was justified in leaving -his house and home because of plaintiff’s nonadherence to .strict religious orthodox practices, but simply the need of the plaintiff and the children, who are not being supported by the defendant. As stated in Loretta B. v. Gerard B. (supra, p. 350): “ In divorce actions, applications for temporary alimony made during the statutory conciliation period must be determined on the basis of ‘ an affidavit of the party seeking the relief which shall relate' only to financial ability and needs of the parties.’ ” As to “ ‘ probability of success ’ * * # [,s]uch a showing is no longer essential.”
The court will consider the papers before it only as to plaintiff’s showing a heed for support in accordance with the standard of living of the parties prior to their separation and the income and financial means -of the parties.
The defendant, who is not an attorney, is a West Point graduate. He has earned several degrees including a B.A., B.S. and M.B.A., and attended the City College -of the City of New York. He has chosen to appear in person. He explains that he engaged an attorney in August -of 1971 but that his attorney refused to represent him and that he has been unable since last August to find a suitable attorney to represent him. He felt his erudi *201 tion and religions studies well qualified him to appear for himself as his own attorney and as a G-aon (a revered Hebrew scholar of judicial authority capable of enunciating the applicable law). His affidavit consists of nine finely typed pages replete with citations of legal, biblical and talmudic authorities, seemingly supporting his position that plaintiff’s application must be denied, and that in any event it would be tantamount to blasphemy to compel him to exceed his annual trust and annuity income in providing for the .support of his wife and three daughters, aged 15, 12 and 10, respectively. Defendant has established himself in a religious community in Monsey, New York, to pursue a life devoted exclusively to Hebrew studies.
On the argument of the motion, defendant took umbrage at the statements of plaintiff’s counsel who claimed that defendant has an income in excess of $9,800 per year. Defendant stated that his annual income is only $9,600. When questioned, in accordance with the court’s usual practice on applications for support, as to what amount or provision he wished to make for the temporary support of plaintiff and his three children, defendant suddenly became mute. On a repetition of the question, defendant chose not to answer and apparently preferred to rely on his affidavit. Though defendant’s self-righteous and religious mien may have been pricked by the question, the court nevertheless, after the argument of the motion, accorded defendant an opportunity to expand on his affidavit. The court so informed defendant by letter addressed to him in Monsey, New York (address furnished by plaintiff’s counsel), since defendant’s answering affidavit contains his former home address. Defendant, however, made no reply. It will be assumed that he does not wish to make further answer.
Defendant in his answering affidavit alleges that he lived with his family for the past six years on his ‘ ‘ Trust and Annuity Income ” which is a “ definite income of about $200 a week The trust agreement submitted to the court permits invasion of the 1 ‘ principal of the Trust Estate at any time or from time to time * * * as to the Trustees may seem advisable * * * but such * * # payments shall not be in excess of $5,000 in any one calendar year.” The trust fund, as shown by the statements of the Chase Manhattan Bank (one of the trustees), dated June 7, 1971, has an inventory value of $94,423.44 and a market value of $67,368.75. In addition, the parties have a joint savings account in which there was originally $11,600. But, as claimed by plaintiff, she was compelled to withdraw in *202 July, 1971 the sum of $5,800 for the future support of herself and the children because of defendant’s abandonment and failure to provide for them. Currently, the plaintiff cannot make withdrawals from the joint account because, as stated by defendant, ‘ ‘ I was forced to freeze the account to protect the remaining money deposited in it for myself.”
Plaintiff’s papers sufficiently demonstrate to the court that the sum of $5,800 withdrawn for support purposes has been depleted and that her net earnings of $75 weekly from part-time employment are wholly insufficient to maintain herself, the three daughters, and pay their tuition of $75 monthly at the Hebrew Day Schools which they attend.
With respect to the defendant’s citations of legal authorities, the cases cited infra by the defendant are inapposite. In Beanland v. Beanland (54 Misc 2d 1010) the plaintiff was granted temporary alimony for her support and the support of the infant issue. Its rationale sustains this plaintiff’s application. In Weinberg v. Weinberg (23 A D 2d 569) the Appellate Division substituted in place of the lower court’s award of temporary alimony a direction that plaintiff draw the same sum from a fund of $15,000 which defendant had placed “ at the disposal of the plaintiff.” Here, the defendant put a “ freeze ” on their joint account. In Dominick v. Dominick (23 A D 2d 645), the Appellate Division modified the lower court’s award of the sums “ proffered ” by the husband because the wife possessed “ substantial assets which she obtained from this husband ’ ’ and theirs was a “ childless marriage.” Defendant here concedes that plaintiff has no assets. Defendant’s other citations are not germane.
With respect to the biblical and talmudic references, defendant, in an effort to demonstrate their applicability, graphically depicts plaintiff’s standard of living from her early childhood as one of six children of a European “ school teacher” (a religious teacher in the Jewish communities of Europe who barely eked out a livelihood and was commonly known as a “ Melamed ”) to her escape at age 13 with her mother to England from the Hitler holocaust; her bare existence in England; her adulthood in the United States where she, with her- mother, initially resided in the Bowery section of Manhattan and then in a “ two room apartment in a walk-up in Washington Heights * * *. In America they never had any money.” Furthermore, the defendant argues that one of the plaintiff’s relatives (her sister) lives with her husband and three teen-aged children under extremely modest circumstances and seeks to establish *203 that standard of living as the criteria for the standard of living which should be applied by this court to the plaintiff and their three children. Defendant, on the other hand, comes from a family of wealth. After his father’s death in 1966, defendant was left with the afore-described trust and annuity income which defendant contends is more than ample, considering his wife’s premarital standard of living, to permit him to completely retire from all mundane occupations and devote all of his waking hours to study.
Defendant’s references to the “ Kethuvah,” the Jewish contract of marriage, to the “ Yoreh Day oh Hilcoth Talmud Torah, ’ ’ chapter 246, paragraphs 21, 25, ‘1 Hagah, ’ ’ are distortions of the law to suit himself, and defendant is best described by a famous quote of Nachmanides, “ a scoundrel within the limits of the Torah.”
At the outset, the example (now established Hebraic law) set by one of the greatest scholars in Rabbinic history, Rabbi Akiba, who would not devote his life to study without his wife’s express consent, forbids defendant from pursuing his newly chosen “life’s work” in Monsey, New York. Defendant’s acknowledgment, “ She also states that I should be working now ‘ to supplement the income he receives from trusts and annuities ’ ” negates any conceivable inference of plaintiff’s consent to defendant’s new “career.” Defendant’s reference to “ Yoreh Day oh ” perverts and traduces its moral teaching that it is meritorious for a man to work for his sustenance and devote the remainder of his free time to study. He is not to so devote his time to study that he must seek “charity” or rely on the largesse of others (“ gifts received from the family from time to. time ” or “ perhaps my mother wants to give us gifts to supplement our income ”).
The nadir of defendant’s conduct is his reference to the “ Kethuvah,” the Jewish contract of marriage. Its clarity and preciseness require no Hebrew scholar to comprehend the husband’s basic obligation: “I will cherish, honor, support and maintain thee in accordance with the custom of Jewish husbands who cherish, honor and support their wives in truth * * * and I will also give thee thy food, clothing and necessaries ’ ’.- This is a sacred promise to care for his wife, not in the manner to which she was accustomed, but in accordance with his station in life.
The court commends to defendant a reading of Exodus, chapter XXI, verse 10; Maimonides, “ Nashim,” Section “ Ishuth,” chapter XII, paragraphs 1, 2 and 5; and the Shulhan *204 Aruch (Code of Jewish Law), Even Ha Ezer, chapters LXIX and LXX, which make it mandatory for a husband to support his wife in accordance with his economic status.
The court can find no basis for defendant’s failure to contribute any funds for the support of plaintiff and his three children since August 9, 1971, nor his effrontery in standing mute when asked how much he wishes to give them. It is a crass excuse that defendant was compelled to “freeze the account to protect the remaining money deposited in it for myself” without inquiring whether the $5,800 drawn in July, 1971 had been completely used up by plaintiff for support purposes.
Accordingly, plaintiff’s motion is granted as follows: Defendant shall pay (a) for the support and maintenance of the children the sum of $39 per week for each child; (b) their tuition at the Hebrew Day Schools which currently aggregates $75 monthly; (c) the current monthly premiums of $40 for Blue Cross and other insurance, and (d) the sum of $1,250 to plaintiff’s counsel for his services rendered and to be rendered, with leave to apply for additional counsel fees at the trial. Said sum of $1,250 shall be payable $625 within 15 days of the service of a certified copy of this order with notice of entry thereon and the balance 10 days after the cause appears on the calendar for trial. Ho award is presently being made to plaintiff as she is employed and has sufficient net earnings for her own support. Should her position change, she may then reapply to this court for proper relief.
I am mindful that defendant will be left with approximately $2,000 per .annum for his own support. Should defendant find such sum inadequate, he has a simple remedy of invading the corpus of his trust fund or using his educational background and talents to pursue mundane employment or employment in the honored profession of a religious teacher.
Upon termination of the conciliation proceedings, plaintiff shall serve her complaint and thereafter shall promptly, either after joinder of issue or upon defendant’s default in answering, notice this case for trial.